UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN EQUITY MORTGAGE, INC., | ) | |
| | ) | |
| Plaintiff/Counter Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 4:05CV1529 RWS |
| | ) | |
| RAY VINSON, JR., | ) | |
| | ) | |
| Defendant/Counter Claimant. | ) | |

## MEMORANDUM AND ORDER

This matter is before me on Plaintiff American Equity Mortgage, Inc.'s ("AEM"), Motion for Preliminary Injunction [#7]. The motion will be granted in part and denied in part. Ray Vinson will be enjoined from using AEM's service marks in commerce, from advertising on behalf of AEM, or from holding himself out to be the "chief" of AEM.

Also before me is Vinson's motion to exclude the testimony of AEM's survey expert pursuant to <u>Daubert</u>. That motion will be denied.

## I. BACKGROUND

AEM is a Missouri corporation that was formed in 1992. From its inception, Deanna Daughhette has always been listed in AEM's public filings as a director and officer of AEM. Ray Vinson has never been listed in AEM's public filings as either an officer or a director. All of the stock of AEM is listed in Daughhette's name.[1] Ray Vinson is one of the founders of AEM.

From 1999 until January 2005, Ray Vinson was AEM's spokesperson. Vinson acted through a company called Vinson Media Group, LLC ("VMG"), which he partly owned. Vinson

---

[1] Vinson and Daughhette are currently in divorce proceedings in St. Louis County. In the divorce proceedings, Vinson and Daughhettee are contesting the ownership of the stock in AEM. Ownership of AEM stock is not at issue before this Court.

regularly appeared in various media promoting AEM, and Vinson's voice, in particular, became closely associated with AEM. As part of its advertising strategy, AEM held out Vinson as its "founder and chief" in various press releases.

On January 3, 2005, Vinson wrote a letter directing all of the radio stations that aired advertisements for AEM that featured Vinson's voice to "run no more commercials, advertisements, etc. containing [his] voice." Later that day, AEM wrote a letter to Vinson and VMG terminating AEM'S relationship with VMG.

Although AEM terminated its relationship with VMG, Vinson continued to advertise for AEM. These advertisements were not authorized by AEM. Vinson created a television ad in which he stated that he was the "founder and chief" of AEM. The ad directed potential consumers to call AEM. He also created circular fans with AEM's logo that stated he was the "founder and chief" of AEM, which he passed out at a St. Louis Cardinals baseball game. The advertising on the fans directed potential consumers to call AEM.

Vinson also maintains a website. The majority of the website is devoted to criticizing AEM's current management and business strategy and to discussing the divorce proceedings between Vinson and Daughhette. Viewers of the website are encouraged to post their opinions regarding AEM's current management. At the time this case was filed, some portions of the website indicated that Vinson was the "founder and chief" of AEM and directed potential customers to call AEM.

AEM filed its motion for a preliminary injunction on October 6, 2005. I held a hearing on November 21, 2005. That hearing was continued to November 28, 2005, to allow Vinson to depose AEM's expert witness, Mr. Rodney Wright.

Wright conducted a survey on whether there was customer confusion as a result of the television ads Vinson ran for AEM after January 2005. The results of the survey show that the majority of people who saw the ad believed that Vinson was associated with AEM. Many of the people who believed that Vinson was associated with AEM thought he was either an officer, a director, the CEO, the spokesperson, the manager, or the chief of AEM. AEM sought to introduce Wright's testimony to prove that Vinson's television ad caused actual customer confusion.

## II. ANALYSIS

### A. *Daubert* Issue

Vinson argues that Wright's testimony should be excluded pursuant to Daubert because it did not survey the correct segment of the public. Vinson argues that the survey should have been limited to potential customers of AEM rather than the St. Louis media market.

I will deny Vinson's Daubert motion for two reasons. First, the main purpose behind Daubert is to protect juries from faulty or "bad" science. There is not yet any jury to protect in this case. As a result, I will consider the evidence before me and accord it the weight I think it deserves. Second, even if the survey is imperfect, it merely confirms what plain English and common sense tell us about the advertising, i.e., Vinson's representation that he is the "chief" of AEM causes people to think he is either running the company in some capacity or is its authorized spokesperson.[2]

---

[2] I noted at the hearing that the definition of the word "chief" also leads us to the same conclusion. Black's defines "chief" as "A person who is put above the rest; the leader." Black's Law Dictionary (7th ed.) at 232. American Heritage defines "chief" as "A person with the highest rank or authority; a leader . . ." The American Heritage Desk Dictionary (1981) at 182.

B.   *Preliminary Injunction Requirements*

"[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981).

C.   *Trademark Infringement*

AEM has alleged three counts of false association and trademark infringement in violation of the Lanham Act. Count I alleges false association under 15 U.S.C. § 1125. Count II alleges trademark infringement under 15 U.S.C. § 1125. Count III alleges trademark infringement under 15 U.S.C. § 1114.

The Lanham Act makes certain representations actionable:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person,
>
> * * *
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such an act.

15 U.S.C. § 1125(a)(1)(A).

AEM argues that Vinson ran afoul of this section when he advertised on behalf of AEM

without its authorization or permission and when he held himself out to be AEM's "chief." I find, for the purposes of this order, that AEM is likely to succeed on the merits of this claim. The evidence on the record shows that Vinson is not currently the "chief" of any department or division of AEM. There is no evidence on the record that Vinson has AEM's permission or authorization to advertise on its behalf. To the contrary, the evidence on the record shows that AEM, through its named officers, has terminated Vinson's authority to speak on behalf of AEM.

I find that it is also likely that AEM may suffer irreparable harm if an injunction is not granted. AEM is entitled to determine its own advertising strategy. It is not appropriate for me to substitute my business judgment for the business judgment of the company. AEM is entitled to determine how to position its products in the market place and who represents its products in the market place. Vinson argues that he is only trying to *help* AEM. But, if Vinson were to continue to advertise on AEM's behalf, potential consumers would continue to associate his name and voice with AEM. And if the state court later decides that Vinson does not have an ownership interest in AEM, then he would presumably be free to start a new mortgage company. At that point Vinson could use his continued unauthorized association with AEM to attract potential customers away from AEM. The purpose of trademark protection is to protect the company's good will and to prevent this type of customer diversion.

I do not find that an injunction will harm any of the parties. To the contrary, the principles that support entering an injunction in this case will benefit AEM and harm no one. The corporation will be allowed to control the use of its marks. Whoever retains the controlling ownership interest after the state court proceedings are resolved will benefit from AEM's control over the use of its marks and from AEM's ability to protect against the unauthorized use of its

marks in court.

Finally, I find that it benefits the public interest when corporations are allowed to control their marks consistent with federal law.

For the foregoing reasons, I will grant AEM's motion for a preliminary injunction as to its claim against Vinson for false association under 15 U.S.C. § 1125(a)(1)(A).

Because of my ruling under 15 U.S.C. § 1125(a)(1)(A), I do not believe it is necessary or appropriate to analyze whether Ray Vinson's advertising activities violate 15 U.S.C. § 1114(1)(a) or § 1125(a)(1)(B).

Accordingly,

**IT IS HEREBY ORDERED** that Vinson's motion to exclude the testimony of Mr. Wright [#47] is **DENIED**.

**IT IS FURTHER ORDERED** that AEM's motion for a preliminary injunction [#7] is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Ray Vinson, Jr., is hereby required, within 72 hours of receipt of this Order:

    (1)    To cease using AEM's name or any of its service marks in commerce in connection with any goods in any manner that represents that Vinson is the chief of AEM, that he is its current spokesperson, or that AEM has authorized him to represent it;

    (2)    Not to place any advertisement (1) for AEM's services, (2) using AEM's name or any of its service marks, or any other attributes that identify it, such as its telephone number, address, or website, or (3) which purports to be made on behalf of AEM;

    (3)    To cease making in commerce, in connection with any goods, services, or commercial activities, any assertion that Vinson is a current officer, director, manager, official spokesperson, or employee of AEM, or any similar false or misleading descriptions of fact, or false or misleading representations of fact, concerning the current affiliation, connection, or association of Vinson with AEM;

(4) To cease representing that Vinson is AEM's "chief";

(5) To remove from his website, http://www.ray99.com, any and all claims to be AEM's "chief," and any instance of AEM's marks or its contact information used in a way that suggests that Vinson is authorized to advertise on behalf of AEM; and

(5) Not to use in public advertising catch phrases that have been long associated with AEM's advertising, such as "fast and easy", "guaranteed low rates," "less than perfect credit" and the telephone numbers of AEM, including the St. Louis telephone number 878-9999.

**IT IS FURTHER ORDERED** that this Order shall remain in effect until a final judgment is entered, or a settlement is reached, in the St. Louis County case <u>In re the Marriage of: Deanna Daughhetee Vinson v. Ray Vinson, Jr.</u>, Cause No. 04FC9863 (Div. 16).

Dated this 12th Day of December, 2005.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE